**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| BLUEGREEN VACATIONS UNLIMITED, INC., a Florida corporation; and BLUEGREEN VACATIONS CORPORATION, a Florida corporation,<br><br>　　　Plaintiffs,<br><br>v.<br><br>TOTTEN FRANQUI DAVIS & BURK, LLC, a Florida limited liability company; ARMG HOLDINGS LLC, a Florida limited liability company, f/k/a American Resource Management Group, LLC d/b/a Resort Release; AMERICAN RESOURCE MANAGEMENT GROUP, LLC, a Delaware limited liability company; AMERICAN RESOURCE MANAGEMENT GROUP, LLC, an Illinois limited liability company; VPL HOLDINGS LLC, a Florida limited liability company, f/k/a Vacation Properties for Less, LLC; VACATION PROPERTIES FOR LESS, LLC, a Delaware limited liability company; REDEMPTION HOLDINGS USA LLC, a Florida limited liability company, f/k/a Redemption and Release, LLC; REDEMPTION AND RELEASE, LLC, a Delaware limited liability company; RESORT EXIT TEAM, LLC, a Florida limited liability company; ERIC S. CLINE a/k/a STEPHEN E. CLINE, an individual; SHYLA CLINE, an individual; and LARRY SCOTT MORSE a/k/a SCOTT MORSE, an individual,<br><br>　　　Defendants. | Case No.: 6:18-cv-2188-ORL-37DCI |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Bluegreen Vacations Unlimited, Inc. ("BVU"), and Bluegreen Vacations

Corporation ("BVC") (together, "Plaintiffs" or "Bluegreen"), hereby sue Defendants, Totten

Franqui Davis & Burk, LLC ("TFDB"); ARMG Holdings, LLC, f/k/a American Resource

Management Group, LLC d/b/a Resort Release ("ARMG"); American Resource Management Group, LLC, a Delaware limited liability company ("ARMG II"); American Resource Management Company, LLC, an Illinois limited liability company ("ARMG (IL)"); VPL Holdings, LLC, f/k/a Vacation Properties for Less, LLC ("VPL"); Vacation Properties for Less, LLC, a Delaware limited liability company ("VPL II"); Redemption Holdings USA, LLC, f/k/a Redemption and Release, LLC ("Redemption"); Redemption and Release, LLC, a Delaware limited liability company ("Redemption II"); Resort Exit Team, LLC ("Resort Exit"); Eric S. Cline, a/k/a Stephen E. Cline ("Eric Cline"); Shyla Cline; and Larry Scott Morse a/k/a Scott Morse ("Morse") (collectively, "Defendants"), and state:

### A.   INTRODUCTION

1.     This action is based on the simple premise that it is false and misleading for a non-party to a contract to advertise and sell the ability to cancel or release a party to that contract from its obligations without any legitimate basis to do so.

2.     Individuals who purchase timeshare interests (the "Bluegreen Owners") enter into valid and binding contracts, or Owner Beneficiary Agreements, and if financing is obtained, promissory notes (the contract and note, if applicable, are referred to herein as the "Timeshare Contracts"). Those Timeshare Contracts control the benefits and obligations of timeshare ownership and the relationship between Bluegreen and the Bluegreen Owners.

3.     Defendants, who are non-parties to the Timeshare Contracts, falsely advertise the ability to "exit" or "cancel" the Bluegreen Owners' Timeshare Contracts, or to unilaterally "transfer" the Bluegreen Owners' interests, through a safe and permanent legal "process." Defendants even guarantee that Bluegreen Owners will be legally and permanently exited from their Timeshare Contracts if they use Defendants' services.

4.     In order to give the appearance of legitimacy and legality, the non-lawyer Defendants associate with a law firm, Totten, which purports to provide legal representation to timeshare owners.  Totten, however, does not offer legitimate legal services, and was created by the non-lawyer Defendants for the sole purpose of operating in their scheme.

5.     Through their false and misleading advertisements, Defendants have deceived numerous Bluegreen Owners into retaining Defendants' services at substantial cost.  Upon being retained, Defendants instruct, deceive, induce, or persuade Bluegreen Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit," "cancellation," or "transfer."  In fact, many of Defendants' advertisements represent that their service includes ability to cease making payments on the Timeshare Contracts.

6.     Defendants do not disclose to the Bluegreen Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to a termination of their beneficial interests and rights in the timeshare.  Lawful cancellation or rescission of a contract is very different in nature than a willful breach and termination of the owners' beneficial interest in timeshare. Defendants advertise the former, only to mislead Bluegreen Owners into the latter.

7.     Each Bluegreen Owner pays Defendants thousands of dollars to default on the Timeshare Contract, having been led to believe that it's an integral step in a proven process. Defendants' "cancellation" services are therefore illusory, and the Bluegreen Owners often do not realize the scam until after the damage is done, when they discover their credit rating is badly damaged due to the default and/or foreclosure.

8.      For these reasons, and the others set forth below, Defendants mislead the Bluegreen Owners into purchasing illusory "cancellation" or "transfer" services and thereby cause and induce the breach of hundreds of Timeshare Contracts.

9.      Bluegreen has no other option but to actively and aggressively seek damages and injunctive relief to prevent Defendants from inflicting further damage to Bluegreen's business and, most importantly, to its relationships with Bluegreen Owners.

10.     This lawsuit is brought by Bluegreen to protect and vindicate its own rights and interests, to recover losses and damages that it has suffered as a result of the Defendants' wrongful conduct, as described in more detail herein, and to preclude Defendants from continuing to engage in these same activities that will continue to cause Bluegreen harm in the future if permitted to continue.

11.     Notably, Bluegreen also brings this action to protect and vindicate the rights and interests of the Bluegreen Owners, who either have been subjected to the Defendants' scam, or may be subjected to the Defendants' scam in the future, and to prevent any further harm that may negatively impact the Bluegreen Owners as a result of the Defendants' violations of federal and state law.

12.     To this end, Bluegreen brings claims for relief for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), intentional interference with contractual relations, civil conspiracy to commit tortious interference, and damages and injunctive relief for violations of the Florida Deceptive and Unfair Trade Practices Act.  Bluegreen seeks both damages and injunctive relief against the Defendants.

B.      **PARTIES**

i.      **The Bluegreen Plaintiffs**

13.     Plaintiff Bluegreen Vacations Corporation ("BVC") is a Florida corporation with its principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, FL 33431.

14.     Plaintiff Bluegreen Vacations Unlimited, Inc. ("BVU") is a Florida corporation with its principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, FL 33431.  BVU is a wholly owned subsidiary of BVC.

ii.      **The Defendants**

15.     Defendant Totten Franqui Davis & Burk, LLC ("Totten") is a Florida limited liability company with its principal place of business located at 1451 West Cypress Creek Road, Suite 211, Fort Lauderdale, Florida 33309.  TFDB Law FL has five principals: (i) Paul G. Totten, Esq., admitted to practice in the State of Florida; (ii) Anthony G. Franqui, Esq., admitted to practice in the states of Florida and Texas; (iii) Garry T. Davis, Esq., admitted to practice in the states of Florida, Ohio, North Carolina, and Missouri;  (iv) Christopher D. Burk, Esq., admitted to practice in the states of Nevada, California, and Arizona; and (v) Erica L. Franqui, Esq., admitted to practice in the State of Florida.

16.     Defendant ARMG Holdings, LLC ("ARMG") is a Florida limited liability company with its principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.  ARMG was formerly operated and known as American Resource Management Group, LLC.  However, on October 29, 2018, American Resource Management Group, LLC registered a name change with the Florida Secretary of State, Division of Corporations, and became ARMG.

- 5 -

17.     Defendant American Resource Management Group, LLC ("ARMG II") is a Delaware limited liability company, also with its principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.

18.     Defendant American Resource Management Group, LLC ("ARMG (IL)") is an Illinois limited liability company with its principal place of business located at 6785 Weaver Road, Suite 1B, Rockford, IL 61114.  ARMG (IL) lists its "assumed names" with the Office of the Illinois Secretary of State as "Resort Exit Team," "Resort Release," and "Redemption Services," which are names that other Defendants in this action also expressly use to do business.

19.     Defendant VPL Holdings, LLC ("VPL") is a Florida limited liability company with its principal place of business located at 1451 West Cypress Creek Road, Suite 316, Fort Lauderdale, Florida 33309.  VPL was formerly operated and known as Vacation Properties for Less, LLC.  However, on October 29, 2018, Vacation Properties for Less, LLC registered a name change with the Florida Secretary of State, Division of Corporations, and became VPL.

20.     Defendant Vacation Properties for Less, LLC ("VPL II") is a Delaware limited liability company, also with its principal place of business located at 1451 West Cypress Creek Road, Suite 308A, Fort Lauderdale, Florida 33309.

21.     Defendant Redemption Holdings USA, LLC ("Redemption") is a Florida limited liability company with its principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.  Redemption was formerly operated and known as Redemption and Release, LLC.  However, on October 29, 2018, Redemption and Release, LLC registered a name change with the Florida Secretary of State, Division of Corporations, and became Redemption.

22.     Defendant Redemption and Release, LLC ("Redemption II") is a Delaware limited liability company, also with its principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.

23.     Defendant Resort Exit Team, LLC ("Resort Exit") is a Florida limited liability company with its principal place of business and registered agent located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.     Until recently, Resort Exit listed a UPS Store located at 1007 North Federal Highway, Suite 367, Fort Lauderdale, Florida 33304 as its principal address.  Resort Exit also maintains a physical location at 6785 Weaver Road, Suite 1B, Rockford, Illinois 61114.

24.     Defendant Eric Cline is an individual and resident of the State of Florida, owning property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.  Eric Cline is a manager of ARMG, VPL, and Resort Exit, is actively involved in the operation and management of Redemption, and is listed as the CEO of VPL II.

25.     Defendant Shyla Cline is an individual and resident of the State of Florida, is married to Eric Cline, and owns property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.  Shyla Cline is a manager of ARMG, is actively involved in the operation and management or Redemption, and is listed as the CEO of ARMG II and Redemption II.

26.     Defendant Larry Scott Morse a/k/a Scott Morse ("Morse") is an individual and resident of the State of Florida, owning property subject to the Florida Homestead Exemption located at 930 NE 16th Avenue, Fort Lauderdale, Florida 33304, and is otherwise *sui juris*.  Morse is a manager of VPL, Redemption, and Resort Exit, is actively involved in the operation and management of ARMG.

### iii.      **Subject Matter Jurisdiction**

27.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Bluegreen asserts multiple causes of action arising under federal law, specifically, claims arising under the Lanham Act, 15 U.S.C. § 1051, *et seq.*  This Court has supplemental subject matter jurisdiction over the remaining claims Bluegreen asserts against the Defendants pursuant to 28 U.S.C. § 1367, as such state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### iv.      **Personal Jurisdiction**

28.      This Court has personal jurisdiction over the Defendants for the following reasons:

i.      over TFDB Law FL, ARMG, Redemption, VPL, and Resort Exit, as they are all organized and existing under the laws of the State of Florida, as they maintain principal places of business and registered agents in the State of Florida, and as they operate, conduct, engage in, or carry on a business venture in the state of Florida, as described herein.

ii.      over ARMG II, Redemption II, and VPL II, as they all maintain their principal place of business in Florida, as they maintain registered agents in Florida, and, upon information and belief, have either continued, joined, or expanded the operation and conduct of ARMG, Redemption, and VPL in Florida.

iii.      Over ARMG (IL), as its managers and members are citizens and residents of the State of Florida, and as it operates, conducts, engages in, or carries on a business venture in the state of Florida, as described herein; and

iv.    over Eric Cline, Shyla Cline, and Morse as they are all residents of the State of

Florida, own real property in the State of Florida, and conduct business in the State of

Florida.

v.    **Venue**

29.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because, as described herein, the events giving rise to Bluegreen's claims occurred in Florida, the vast majority of the Defendants reside in this District under § 1391, Bluegreen-affiliated resorts are located in this District, Bluegreen maintains a corporate office in this District, and a portion of the Defendants' conduct giving rise to the claims set forth herein occurred in this District.

vi.    **Conditions Precedent; Attorneys' Fees**

30.    All conditions precedent to this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

31.    Bluegreen has retained the services of its undersigned counsel to represent it in this matter and is obligated to pay reasonable attorneys' fees.  Bluegreen is entitled to recover its attorneys' fees from Defendants under federal and state law, including, without limitation, pursuant to 15 U.S.C. § 1117, and Fla. Stat. § 501.2105.

C.    **BACKGROUND ON THE TIMESHARE INDUSTRY**

32.    Timeshare properties revolutionized the vacation and travel industry and have been a popular option for families for decades.  Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

33.     The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Bluegreen, can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e., deeded ownership.

34.     Developers also sell membership interests to consumers in the form of points. Bluegreen offers points through the Bluegreen Vacation Club®.  Such points are then, in turn, exchanged for use at Bluegreen properties.  Bluegreen also partners with RCI, an affiliated company that allows Bluegreen Owners to use their ownership at Bluegreen resorts to stay at additional properties that Bluegreen does not own, further expanding consumers' choices.

35.     This concept has allowed consumers an incredible opportunity to enjoy regular vacations at a fraction of the typical cost and without the burdens associated with undivided vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

36.     Today, the timeshare industry continues to thrive.  As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers." As of 2016, 9.2 million households in America were timeshare owners.

### D.      BLUEGREEN & ITS VALID TIMESHARE CONTRACTS

37.     Bluegreen is a leader in the timeshare and vacation ownership industry that provides a premier network of resorts across North America.  Bluegreen also maintains strategic partnerships with other companies and well-known brands to further enhance the experience of Bluegreen Owners.

38.     BVU devotes substantial resources to advertising and other marketing promotions in an effort to maintain and enhance the value of its own established brands.

39.     Bluegreen Owners enter into valid and binding contracts for their timeshare interests, with each Bluegreen Owner signing an Owner Beneficiary Agreement, and if applicable, a promissory note (the "Timeshare Contract"), sometimes with an affiliated facilitator also signing the Timeshare Contract.  By executing the Timeshare Contract, Bluegreen Owners agree to pay an amount certain in exchange for an agreed-upon number of vacation points, as well as certain common assessment fees and club dues for the upkeep of the timeshare units and common areas of the timeshare resort properties and the Bluegreen Vacation Club plan.

40.     Often, if a purchaser desires mortgage financing, he or she may apply, and after approval, execute a promissory note, which is referenced and incorporated into the Timeshare Contract.  Lending and financing options are offered to prospective Bluegreen Owners through BVC, who is typically the creditor under promissory notes executed by Bluegreen Owners that obtain financing.

41.     The Bluegreen Owners' Timeshare Contracts are legally binding contracts upon their execution.  Applicable state law provides a statutory rescission period by which any Bluegreen Owner may rescind his or her Timeshare Contract and receive a full refund of the purchase amount.  However, once the statutory rescission period expires, the Timeshare Contract cannot be unilaterally rescinded.

### E.     TIMESHARE "EXIT" COMPANIES THAT SCAM AND DEFRAUD TIMESHARE OWNERS FOR PROFIT

42.     In the aftermath of the late 2007 recession, a select group of individuals saw an opportunity to make fast cash from timeshare owners who no longer preferred to use their timeshare ownership for vacations.

43.     These individuals launched what have become known as "timeshare exit" or "third party exit" (TPE) companies that promote and market the ability to get timeshare owners released or otherwise discharged from their contracts – including the attendant financial obligations – with timeshare developers like Bluegreen.

44.     Through various forms of advertising, TPE companies frequently state or imply that they have some sort of "process" or "method" to assist consumers in "canceling" or "exiting" their timeshare contracts.  TPE companies suggest that their services are necessary to cancel their timeshare contracts.  In reality, though, TPE companies have no method of helping consumers end their timeshare ownership.  At most, they merely retain lawyers to threaten litigation on the owners' behalves.

45.     As the price for their "cancellation" services, TPE companies demand exorbitant up-front fees from the timeshare owners – usually several thousand dollars per timeshare interest.  TPE companies also actively discourage owners from contacting timeshare developers to directly address their needs, when the timeshare developer may be able to address the owners' directly, and at no cost.  In fact, Bluegreen directly facilities communications of this nature with its timeshare owners through its website, https://www.bluegreenvacations.com/talk-to-bluegreen-vacations-were-here-tohelp/?utm _medium=referral&utm_source=arda-landingpg&utm_campaign=arda.

46.     Nevertheless, after securing the up-front payments, TPE companies instruct owners to stop communicating with and stop sending payments to the timeshare developers, in order to facilitate the "exit" process.  In this way, TPE companies guide the owners' timeshare interests into default and eventual foreclosure.

47.     The TPE companies then "work" to cancel the timeshare contracts.  What they typically do is retain attorneys to send demand letters to the timeshare developers, demanding that the developers release the individual owners from their contracts.  Usually, these are form demand letters without specifics relating to the particular owners and, in the opinion of the developers, completely without legal merit.

48.     Although the attorneys in such schemes are typically retained by the TPE companies directly, and *not* by the owners, the demand letters (i) state that the attorneys represent the owners and (ii) forbid communication between the developers and the owners (sometimes citing to attorney ethics rules, provisions of the Fair Debt Collection Practices Act, etc.).  By making these representations, TPE companies and their affiliated attorneys prevent the timeshare developers like Bluegreen from warning their owners of the consequences of utilizing the TPE companies' fraudulent services.

49.     When the attorneys' demands go unmet, the TPE companies prolong their clients' expectations regarding how long a successful "exit" can take.

50.     Eventually, when either (1) the timeshare interest is finally foreclosed; or (2) the owner's beneficial interest in the timeshare is terminated pursuant to the terms of the Timeshare Contract, the TPE Entities declare that the owner has been successfully "exited" or "released" from the timeshare, or that that owner's obligations were "cancelled" or "redeemed."

51.     Frequently, the former timeshare owners are not aware that their timeshare interests were actually foreclosed and/or terminated until they later discover their credit ratings were adversely impacted.

52.     Another frequent variation of the "exit" scheme is for the TPE companies to fraudulently transfer an owner's timeshare interest via quitclaim deed or similar instrument,

without the required approval of the timeshare developer, to a shell entity or strawman buyer who then fails to make payments on the timeshare interest as required.  Because the transfer was not approved, the timeshare developer looks to the original owner of the timeshare interest for payment while the original owner is completely unaware that he or she is still the legal owner of the timeshare interest.  The Florida Vacation Plan and Timesharing Act specifically prohibits this scheme of fraudulent transfers.  *See* Fla. Stat. § 721.17.

53.     Under either type of scheme, consumers (like Bluegreen Owners) are deceived and persuaded to pay exorbitant fees to the TPE companies under the auspices that they can and will cancel their timeshare contracts, but the advertised services are impossible, illusory, and illegal.

54.     Ultimately, not only are the developer's relationships with its owners irreparably damaged, the developers are dramatically financially impacted by the loss of millions of dollars in contract-based revenue.

55.     As for the timeshare owners, they lose their timeshare interests and rights therein through foreclosure, termination, or deed-in-lieu transfers and suffer significant negative impact on their credit.

56.     Consistent throughout all TPE schemes is the underlying reality that TPE companies purposely fail to inform consumers that, by utilizing their so-called methods, the owners actually breach and default on their timeshare contracts rather than achieve any lawful release.

**F.     THE SCHEME TO DEFRAUD BLUEGREEN OWNERS.**

**i.  The Structure of the Scheme.**

57.     Defendants ARMG, Redemption, VPL, and Resort Exit are TPE companies (hereinafter, the "TPE Defendants") that engage in deceptive tactics within the timeshare

industry.  The TPE Defendants are inter-related to each other and to the Totten firm, as set forth in greater detail below, thus they belong as defendants in the same lawsuit.  For ease of reference, a chart showing the inter-relationship among all the Defendants is attached hereto as Exhibit 1.

58.     The primary architects of the overall scheme are Eric Cline, Shyla Cline, and Morse.  Eric Cline and Shyla Cline began operating ARMG (IL) in Rockford, Illinois in 2012.  Eric Cline and Shyla Cline later moved their operations to Fort Lauderdale, Florida, where they incorporated ARMG as an additional entity.  Morse began operating Redemption in Orlando, Florida in 2011.  Although Redemption and the ARMG entities were initially competitors, the entities later began working in conjunction to offer "exit" services to timeshare owners across the United States.

59.     Since joining together, the Clines and Morse co-manage and co-operate ARMG and Redemption.  Both ARMG and Redemption operate numerous websites that falsely advertise and sell timeshare "exit," "cancellation," "transfer," or "redemption" services (the specific websites and domain names know to Bluegreen, together with the false, misleading, and deceptive statements and representations made on such websites, are set forth in detail below).  These websites offer consumers the ability to contact ARMG and Redemption through various methods, including by telephone and by online portal where consumers can submit their name, telephone number, and the name of the resort where the consumer owns a timeshare.  ARMG has also advertised through the radio.

60.     Timeshare owners that contact ARMG or Redemption through their websites are directed to a call center in Fort Lauderdale, Florida operated by ARMG.  Notably, ARMG and Redemption advertise their headquarters as being located in Rockford, Illinois to give the

appearance of companies operating out of the mid-western United States.  In fact, call center representatives located in Fort Lauderdale are supplied with a "fact sheet" containing certain facts unique to Rockford, Illinois (including, local landmarks, schools, sports teams, etc.), which allows the representatives to deceive callers into believing that the call center is located in Rockford.

61.     Call center representatives follow one or more type-written scripts that inform the timeshare owners that their information is being taken as part of the "qualification" process.  For example, one call center script for employees to read contains the following:

> Well, what I can do is take down some informatino [sic] on your ownership and see if it qualifies for our service . . . What the next step will be is for me to submit the information you just provided me into your [sic] Qualification Department. We do this to make sure the specifics on your ownership would qualify for our liquidation program, and is something we can acquire into our inventory portfolio.

In fact, no legitimate qualification process exists, and ARMG and Redemption accept any timeshare owner that is willing to pay the required up-front fees.  The qualification script is intended to give the timeshare owner the false impression that the services are limited or scarce, and that the timeshare owner may not be able to obtain the advertised "exit" or "transfer" service.

62.     Timeshare owners are later informed that they qualify, and then sold one of two services depending on whether their timeshare is encumbered with a mortgage: if the timeshare owner's interest is encumbered by a mortgage, the owner is offered enrollment in the Resort Release Group Legal Services Plan (the "GLSP"); if the timeshare is unencumbered, the owner is offered a "transfer service."  Neither service is legitimate.

63.     First, timeshare owners offered enrollment in the GLSP are given a telephone sales pitch, whereby a sales representative suggests that the timeshare owner's consumer rights

had been violated, and that such violation allows the owner to "cancel" their timeshare contract obligations without breaching the contract. ARMG and Redemption then induce timeshare owners to cease making payments on their timeshare contacts to facilitate the cancellation process (which, not coincidentally, also results in the timeshare owner having sufficient funds to pay ARMG and/or Redemption's fees). After the timeshare owner pays the required fees, the timeshare owner is referred to Totten for further representation through the GLSP. As described in more detail below, Totten sends various demand letters to the timeshare developer, but typically does nothing further to stop or oppose termination of owner beneficiary interests or foreclosure of the timeshare owner's interest.

64.    The "GLSP" that is sold to timeshare owners is illusory and deceptively advertised in several ways:

     i.     No document exists that establishes the GLSP, governs its operation, sets forth membership criteria, or otherwise establishes policies, procedures, or guidelines that apply to the GLSP.

     ii.     Legitimate group legal services plans offer prepaid legal services to a community of interest (i.e., churches, employees of a common employer, associations, educational institutions, etc.) that exist independent of the need for legal services. The GLSP offered by ARMG fails to comprise any community of interest independent of the need for legal services; indeed, every single person enrolled in the GLSP is referred to Totten for representation.

     iii.     None of the Defendants discloses to timeshare owners that the GLSP has never been approved by any state bar association or regulator, and has

actually been denied approval by the Florida Bar on more than one occasion. In 2018, and again in 2019, Totten applied for approval from the Florida Bar, but was denied approval because (as noted above) the GLSP does not offer membership to a bona fide "group" of common interest. Despite lacking any approval, ARMG, Redemption, and Resort Exit (including their successor Delaware entities) continue to market, advertise, and sell timeshare owners enrollment in to the GLSP as though it were legitimate.

iv. The advertising and marketing materials associated with the GLSP falsely guarantee that an "exit" or "cancellation" can be obtained as a result of enrollment in the GLSP, when in fact, such a result is only obtained through the GLSP if the timeshare developer agrees to cancel the owner's timeshare contract.

65. Second, timeshare owners that receive the "transfer service" are told that no secondary market exists for the resale of their timeshare contract, which is literally false, and gives the timeshare owner the false impression that they have no options but to retain ARMG's services. ARMG then falsely states that it maintains relationships with other entities that will take timeshare inventory from ARMG in exchange for ARMG's payment of a fee; however, in order to perpetuate the initial deception that no resale market exists, ARMG tells timeshare owners that it does not resell the timeshares on the open market.. The timeshare owner is then issued an "inventory control number" while ARMG purports to hold the timeshare.

66. In reality, there is a resale market for timeshares. Timeshare owners are able to sell and transfer their timeshares in accordance with the express terms of their Timeshare

Contracts.  Further, for those timeshare owners that do not wish to resell their interest on their own, several legitimate timeshare brokerage services exist to assist such timeshare owners.

67.     Additionally, there are no relationships with other entities whereby ARMG has to pay those entities to take inventory.  Instead, the timeshare interests are typically listed for sale by VPL (and later, VPL II) through various outlets, including eBay.  Because the ARMG and VPL entities are controlled by the same individuals (the Clines and Morse), the very same people that advertise that there is no resale market for timeshares are themselves actively engaged in that resale market. Resort Exit is another entity created by Eric Cline and Morse.  Resort Exit was created with a name similar to other, larger companies that advertise the same timeshare "exit" schemes to consumers.  Resort Exit exists for the sole purpose of confusing timeshare consumers that are seeking out other timeshare "exit" companies and capturing those companies' customer base for Resort Exit's own benefit.  To accomplish this purpose, Resort Exit maintains its own websites and domain names containing false advertisements (detailed below).

68.     Resort Exit maintains virtually no existence independent of ARMG or Redemption.  Resort Exit shares the same principals, and also shares the same office space.  Consumers that contact Resort Exit are directed to ARMG's call center in Fort Lauderdale, FL, and ARMG continues the scam from there as described above.

69.     VPL is yet another entity created by Eric Cline and Morse.  Part of the sales pitch that ARMG and Redemption make to consumers involves a representation that their services do not involve any resale of the timeshare interest.  Eric Cline and Morse created VPL as a vehicle to re-sell timeshare interests on the open market, in contradiction to what is represented to the timeshare owner, without any apparent connection to ARMG or Redemption.  Additionally, VPL independently advertised its services through www.vacationpropertiesforless.com, which

purported to offer the "transfer" services to timeshare owners (the website has since been taken offline).

70.     VPL also maintains virtually no existence independent of the other TPE Defendants, as it shares the same principals and maintains the same addresses.

71.     ARMG (IL) is a separate Illinois limited liability company created and operated by the Clines.  ARMG (IL) conducts the same operations as ARMG through the call center located in Fort Lauderdale, and may not maintain any operation or existence that is truly independent from that of ARMG.

72.     As a direct result of TPE Defendants' advertising and subsequent dealings with Bluegreen Owners, as described immediately above, Bluegreen Owners cease making payments on their Timeshare Contracts and otherwise default on and breach their Timeshare Contract obligations.

      ii.     **The Creation of ARMG II, Redemption II, and VPL II for Fraudulent Purposes, and Their Participation in the Timeshare Exit Scheme.**

73.     As noted previously, on October 29, 2018, the Clines and Morse changed the names of the three of the TPE entities engaged in the conduct described above, and styled them as holding companies:

    i.     "American Resource Management, LLC" suddenly had its name changed to "ARMG Holdings LLC"  (defined herein as "ARMG");

    ii.     "Redemption and Release, LLC" had its name changed to "Redemption Holdings USA, LLC" (defined herein as "Redemption"); and

    iii.     "Vacation Properties for Less, LLC" had its name changed to "VPL Holdings LLC" (defined herein as "VPL").

74.     Previously, the Clines and Morse had created three new Delaware limited liability companies and registered them with the Florida Division of Corporations.  Importantly, these

three Delaware limited liability companies have the exact same names that Florida limited liability companies had before the name-change described above.   Specifically, the three Delaware limited liability companies that the Clines and Morse created are:

  i.  American Resource Management, LLC (defined herein as "ARMG II");

  ii.  Redemption and Release, LLC (defined herein as "Redemption II"); and

  iii.  Vacation Properties for Less, LLC (defined herein as "VPL II").

  75.  Upon information and belief, ARMG II, Redemption II, and VPL II entities were created as a subterfuge to further complicate the network of corporate entities through which the scheme against Bluegreen Owners (and other timeshare owners) is effectuated, making any judgment more difficult to enforce.   Thus, ARMG II, Redemption II, and VPL II appear to have been created for fraudulent purposes, including, without limitation, the evasion of potential judgment creditors and any injunction that might be entered against the older TPE entities.

  76.  Furthermore, ARMG II, Redemption II, and VPL II appear to have begun acting in concert with ARMG, Redemption, and VPL, respectively, to carrying out the very same scheme described above, and in the very same manner, using the same employees, physical locations, and sales and advertising practices.   This includes the use of the same false, misleading, and deceptive online advertisements alleged below.   Accordingly, the ARMG II, Redemption II, and VPL II are merely alter egos of the limited liability companies that previously operated under the same names.

## G.  FALSE ADVERTISING BY THE TPE DEFENDANTS

  77.  In order to generate new customers and continue to drive profits, the ARMG, ARMG II, ARMG (IL), Redemption, Redemption II, VPL, VPL II, and Resort Exit falsely advertise and market to timeshare consumers, including Bluegreen Owners, a "process" or "method" that permits the timeshare consumers to lawfully and unilaterally cancel, rescind, or

otherwise terminate their Timeshare Contracts and the obligations thereunder.  In reality, no "process" or "method" exists, and none of the Defendants can truthfully offer any service or product that results in the legitimate cancellation of a Timeshare Contract with Bluegreen.

78.     The TPE Defendants' false, misleading, and deceptive advertisements and marketing takes numerous forms, including online advertising and marketing through websites and domain names, telephone advertising and marketing through call centers, or both, with consumer leads being funneled from the TPE Defendants' deceptive websites to the call centers.

79.     The advertisements are either literally false or they are deceptively misleading. Again, there is no third-party basis to "exit" or "cancel" a timeshare contract.  There can certainly be no guaranteed result when such result is dependent on Bluegreen's agreement.

80.     The advertisements fail to disclose that the actual process or method of terminating a timeshare contract is through breach and default, and that a termination and/or fraudulent transfer of the owners' beneficiary interest is what the Defendants consider to be a "successful exit."  The advertisements also fail to disclose the severe negative impact on a Bluegreen Owner's credit and finances if they follow the advertised "process."

81.     Furthermore, there are no advertisements by the Defendants that are specific to the GLSP, or to the Totten law firm.  Nonetheless, a timeshare owner responding to any of the Defendants advertisements will be enrolled in the GLSP if he or she has a mortgage encumbering his or her timeshare.  Because anyone responding to Defendants' advertisements will be enrolled in the GLSP if they have a mortgage, all of the advertisements at issue in this lawsuit are advertisements related to the GLSP.

82.     The specific facts as to each of the individual TPE Defendants' false advertisements are set forth below:

i.    **False, Misleading, and Deceptive Online Advertising by ARMG and ARMG II**.

83.    Defendant ARMG owns and operates at least two websites that advertise and market timeshare-related services:    www.americanresourcemanagementgroup.com,    and www.resortrelease.com.

84.    The website    www.americanresourcemanagementgroup.com    contains, or has contained, numerous false, misleading, and deceptive statements, which include, but are not limited to the following:

   i.    https://americanresourcemanagementgroup.com/    advertises,    "Cancel    Your Timeshare, Forever . . . " and "Timeshare Release Services";

   ii.    https://americanresourcemanagementgroup.com/    asks: "Need Your Contract Cancelled Now?";

   iii.    https://americanresourcemanagementgroup.com/    states: "Our intake managers offer free advice and guide you through our tried and proven process resulting in timeshare redemption.";

   iv.    https://americanresourcemanagementgroup.com/    states: "Permanent and Legal Transfer Of All Obligations" and "Let us help you legally get rid of your contract, forever.";

   v.    https://americanresourcemanagementgroup.com/the-help-you-need/    states,    "We offer a low-cost, 100% money-back guaranteed process that frees vacation owners of any and all financial obligation to their resort.";

   vi.    https://americanresourcemanagementgroup.com/    states, "End All Future Fees";

   vii.    https://americanresourcemanagementgroup.com/contact-us/    states,    "What does American Resource Management Group do? We are a company that helps remove timeshare owners from their timeshare obligations. We offer an affordable, convenient, and guaranteed end to your timeshare contract.";

   viii.    https://americanresourcemanagementgroup.com/the-help-you-need/    states,    "We offer a low-cost, 100% money-back guaranteed process that frees vacation owners of any and all financial obligation to their resort.";

   ix.    https://americanresourcemanagementgroup.com/: "If your property does qualify for our release program, we will attend to your case until you are free of all financial obligations to your resort."; and

x. https://americanresourcemanagementgroup.com/the-help-you-need/      states, "American Resource Management Group employs a fully staffed, in-house, legal department that oversees all internal compliance while keeping up with the always changing legal requirements involved with each resort."

85.    The website www.resortrelease.com contains, or has contained, numerous false,

misleading, and deceptive statements, which include, but are not limited to the following:

i. https://www.resortrelease.com/faqs/ states: "What does Resort Release do? We are a timeshare release company that helps remove timeshare owners from their unwanted timeshare properties. We guarantee to get you out of your timeshare contract. Period.";

ii. https://www.resortrelease.com/faqs states: "The fees associated with our services are collected upfront, but only after you have thoroughly reviewed our Transfer Agreement and you understand how our guaranteed process works.";

iii. https://www.resortrelease.com/ states: "LEGAL CANCELLATION. Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.";

iv. https://www.resortrelease.com/faqs/ states: "Is ResortRelease.com a legitimate solution to removing my family from our timeshare contract?  We are proud to say that we are one of the only A+ rated, BBB accredited timeshare release companies in the industry. We have already helped thousands of people legally and permanently get out of their timeshare. We always put our clients first and all of our services are guaranteed.";

v. https://www.resortrelease.com/ states, "GUARANTEED RESULTS.  We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.";

vi. https://www.resortrelease.com/ also states, "GUARANTEE POLICY: Legally and permanently getting out of your timeshare has never been this easy.";

vii. https://www.resortrelease.com/services states, "Guaranteed Contract Termination. Your attorneys will diligently, competently, and effectively represent you in seeking the termination of your timeshare contract.";

viii. https://www.resortrelease.com/services also states, "We are so confident in our services that we give you three separate 100% guarantees. Over the past 6 years we have helped over 12,600 desperate families transfer out of their timeshare properties. If you are not timeshare free at the end of our service, we will refund 100% of your money."; and

ix.  https://www.resortrelease.com/services states: "Unfortunately, many resorts today have placed significant obstacles in front of those wanting to get rid of their timeshare."

86.  ARMG's statements through its websites are false, misleading, and deceptive in that they misrepresent that ARMG's services: (i) provide the ability to "exit," "cancel," or "release" timeshare owners from their Timeshare Contracts, when ARMG is unable to perform such a service; (ii) include or provide a "process" or "method" by which the consumer can exit, cancel, rescind, or be released from his or her Timeshare Contract, when no such process or method exists; (iii) result in the "legal," "lawful," "legitimate," or "safe" termination of a Timeshare Contract, when, in fact, the only services ARMG offers result in the consumer's unlawful and default under his or her obligations in the Timeshare Contract; (iv) provide a "guaranteed" means of providing exiting, canceling, rescinding, or releasing the consumer form the terms of the consumer's valid and binding Timeshare Contract, when ARMG lacks any ability to provide such a result; and (v) allow the timeshare owner to cease payments toward a mortgage or maintenance fees or otherwise discontinue performance of a Timeshare Contract, when ARMG has failed to secure the agreement from the developer (such as Bluegreen), which would be required for such a result.   ARMG's statements also falsely state or imply that ARMG's services are the only avenue for timeshare owners to choose because timeshare developers are unwilling to address the owners' needs, when, in truth, timeshare developers, are frequently able to assist owners based on their circumstances.

87.  In addition to the above misrepresentations, ARMG's websites often misrepresent that various individuals have just "enrolled" or retained their services.   These are fake announcements, either because the individuals are non-existent or the immediate timing of the

announcements is false.    Examples of these announcements captured from www.resortrelease.com are as follows:



88.    ARMG also engaged in other forms of online advertising, such as through search engines, social media platforms, and paid advertisements on unrelated websites.  For example, ARMG has published the following online advertisements:



89.    ARMG also misleads consumers by implying that lawyers are on staff that will represent timeshare owners.  https://americanresourcemanagementgroup.com/the-help-you-need/ states (or has stated) that "American Resource Management Group employs a fully staffed, in-house, legal department that oversees all internal compliance while keeping up with the always changing legal requirements involved with each resort."

ii.     <u>**False, Misleading, and Deceptive Online Advertising by Redemption and Redemption II.**</u>

90.     Defendant Redemption owns and operates several websites that advertise and market timeshare-related services, including, without limitation, the following:

      i.     www.redemptionandrelease.com;

      ii.     www.redemptionandrelease.ca;

      iii.     www.cancelatimesharecontract.com; and

      iv.     www.myredemptionservices.com.

91.     These websites contain, or have contained, numerous false, misleading, and deceptive statements, which include, but are not limited to, the following:

      i.     https://www.redemptionandrelease.com/ asks: "Need Your Contract Cancelled Now?";

      ii.     https://www.redemptionandrelease.com/ states: "If you've tried and failed to get out of your timeshare contract obligations through attempts to sell your timeshare, cancel a timeshare contract, or donate a timeshare, now is the time to find out how to legally redeem your timeshare.";

      iii.     https://www.redemptionandrelease.com/ states: "Redemption and Release, LLC is the nation's premiere Timeshare Redemption company because we offer a no-haggle, low cost, and twice guaranteed timeshare exit solution. We provide an inexpensive way to get out of a timeshare.";

      iv.     https://www.redemptionandrelease.com/ states, "STOP all annual fees. You will no longer be obligated to pay any annual maintenance fees associated with timeshare ownership. In just 3 easy steps, you will be free of ever-increasing timeshare fees and special assessments…legally AND permanently!";

      v.     https://www.redemptionandrelease.com/how-it-works-2/ states, "You will discover over time that the only option you have is to either keep paying your resort tens of thousands of dollars in maintenance fees over the next number of years, or sign up to use our services which provide you a friendly and professional guaranteed timeshare redemption service.";

      vi.     https://cancelatimesharecontract.com/ advertises: "Cancel A Timeshare Contract.";

vii.    https://cancelatimesharecontract.com/ states: "After over 7 years in the industry, We've uncovered true and trusted methods for canceling any timeshare.";

viii.    https://cancelatimesharecontract.com/cancel-timeshare-ownership/ states: "If you are tired of your timeshare points, we have partnered with a group of timeshare cancellation experts that specialize in timeshare ownerships. These timeshare experts will walk you through all of the steps to getting rid of your timeshare legally and permanently forever.";

ix.    https://cancelatimesharecontract.com/buyback-timeshare/ states, "Canceling your timeshare will enable you a guaranteed alternative to stop paying all future maintenance fees and legally get out of your timeshare permanently! The best approach would be to work with a company like REDEMPTION & RELEASE LLC that have helped countless individuals cancel their timeshare with a 100% success rate!";

x.    http://myredemptionservices.com/ states: "The Timeshare Redemption service we offer guarantees our clients a permanent and successful end to their timeshare obligations.";

xi.    http://myredemptionservices.com/faqs/ states: "What does Redemption Services do? We are a company that helps remove timeshare owners from their timeshare obligations. We offer an affordable, convenient, and guaranteed end to your timeshare contract.";

xii.    http://myredemptionservices.com/ states: "Simple, Easy & Fast Process";

xiii.    http://myredemptionservices.com/guarantee/ states: "Our quick and easy process of timeshare redemption typically provides for a legal and permanent transfer of your ownership in well under 90 days."; and

xiv.    http://myredemptionservices.com/guarantee/ states, "100% GUARANTEE No Future Fees on timeshare ownership."

92.    Redemption also operates and controls www.armgtransfers.com, which redirects users to back to www.americanresourcemanagementgroup.com, which contains the false, misleading, and deceptive statements and advertisements set forth above.

93.    Redemption also operates and is responsible for the content of the following domain names, which either (1) redirect consumers back to the website

www.redemptionandrelease.com/ or (2) contain content that is identical to that found at www.redemptionandrelease.com/:

    i.    www.redemptionandreleasescam.com;

    ii.    www.redemptionandreleasehelp.com;

    iii.    www.redemptionandreleasetimeshare.com;

    iv.    www.redemptionandreleasecomplaints.com;

    v.    www.redemptionandreleasellc.com;

    vi.    www.redemptionrelease.com;

    vii.    www.redemptionreleasellc.com;

    viii.    www.timeshareoutreviews.com;

    ix.    www.redeemtimeshare.com;

    x.    www.timeshareoutreviews.com;

    xi.    www.itaketimeshare.com; and

    xii.    www.itaketimeshares.com.

94.    Redemption's statements through these websites are false, misleading, and deceptive in that they misrepresent that Redemption's services: (i) provide the ability to "exit," "cancel," or "release" timeshare owners from their Timeshare Contracts, when Redemption is unable to perform such a service; (ii) include or provide a "process" or "method" by which the consumer can exit, cancel, rescind, or be released from his or her Timeshare Contract, when no such process or method exists; (iii) result in the "legal," "lawful," "legitimate," or "safe" termination of a Timeshare Contract, when, in fact, the only services Redemption offers result in the consumer's unlawful and default under his or her obligations in the Timeshare Contract; (iv) provide a "guaranteed" means of providing exiting, canceling, rescinding, or releasing the

consumer form the terms of the consumer's valid and binding Timeshare Contract, when Redemption lacks any ability to provide such a result; and (v) allow the timeshare owner to cease payments toward a mortgage or maintenance fees or otherwise discontinue performance of a Timeshare Contract, when Redemption has failed to secure the agreement from the developer (such as Bluegreen), which would be required for such a result. Redemption's statements also falsely state or imply that Redemption's services are the only avenue for timeshare owners to choose because timeshare developers are unwilling to address the owners' needs, when, in truth, timeshare developers, are frequently able to assist owners based on their circumstances.

### iii.   **False, Misleading, and Deceptive Online Advertising by Resort Exit.**

95.     Defendant Resort Exit owns and operates www.resortexitteam.com as a website that advertises and markets timeshare-related services. The website contains, or has contained, numerous false, misleading, and deceptive statements, which include, but are not limited to the following:

    i.    https://resortexitteam.com/ advertises: "Guaranteed Exit" and "Our Resort Exit Team has perfected the process of legally and permanently ending your timeshare.";

    ii.    https://resortexitteam.com/ states: "The timeshare exit process is quick, simple and guaranteed.";

    iii.    https://resortexitteam.com/ states: "Legal Relief and Permanent Results" and "Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.";

    iv.    https://resortexitteam.com/ states, "If accepted as a client, we will guarantee the outcome.";

    v.    https://resortexitteam.com/services/ states, "Our Services: End All Timeshare Obligations Guaranteed.";

    vi.    https://resortexitteam.com/ states, "Understanding the legal complexities of timeshare ownership is our specialty. The resorts and their lobbyists have created

a system that makes it feel virtually impossible to get rid of your timeshare without expert help."; and

vii.    https://resortexitteam.com/ states, "Understanding the legal complexities of timeshare ownership is our specialty. The resorts and their lobbyists have created a system that makes it feel virtually impossible to get rid of your timeshare without expert help."

96.    Resort Exit's statements through these websites are false, misleading, and deceptive in that they misrepresent that Resort Exit's services: (i) provide the ability to "exit" timeshare owners from their Timeshare Contracts, when Resort Exit is unable to perform such a service; (ii) include or provide a "process" or "system" by which the consumer can exit, cancel, rescind, or be released from his or her Timeshare Contract, when no such process or method exists; (iii) result in the "legally binding" termination of a Timeshare Contract, when, in fact, the only services Resort Exit offers result in the consumer's unlawful and default under his or her obligations in the Timeshare Contract; and (iv) provide a "guaranteed" means of "exiting" the timeshare owner from the terms of the timeshare owner's valid and binding Timeshare Contract, when Resort Exit lacks any ability to provide such a result.  Resort Exit's statements also falsely state or imply that Resort Exit's services are the only avenue for timeshare owners to choose because timeshare developers are unwilling to address the owners' needs, when, in truth, timeshare developers, are frequently able to assist owners based on their circumstances.

**iv.    False, Misleading, and Deceptive Online Advertising by VPL and VPL II.**

97.    Defendant    VPL    owns    (and    formerly    operated) www.vacationpropertiesforless.com as a website that advertise and market timeshare-related services.  The website contained numerous false, misleading, and deceptive advertisement of "transfer" services to timeshare owners, including the statement that "Vacation Properties For

Less is licensed brokerage that specializes in timeshares. This means a fast, safe, and secure transfer of ownership."

98.     VPL's statements through these websites are false, misleading, and deceptive in that they misrepresent that VPL's services: (i) provide the ability to "transfer" timeshare owners out of their Timeshare Contracts, when VPL is unable to perform such a service without Bluegreen's consent (which is never sought or obtained); and (ii) result in the "fast, safe, and secure" transfer of a Timeshare Contract, when, in fact, the only services VPL offers result in the consumer's unlawful and default under his or her obligations in the Timeshare Contract.

## H.     TOTTEN'S INVOLVEMENT WITH THE TPE DEFENDANTS

### i.     ARMG's Use of Law Firms Before Totten.

99.     In order to perpetuate the illusion of "working" to cancel a Bluegreen Owners' Timeshare Contracts, and to perpetuate their scheme of preventing outside communication with Bluegreen Owners, the TPE Defendants must affiliate with, or directly retain, lawyers to purportedly represent the Bluegreen Owners for the purpose of demanding that Bluegreen agree to cancel the Timeshare Contract or else face litigation from the Bluegreen Owner.  In fact, none of the TPE Defendants offer a service to Bluegreen Owners other than a referral to Totten through the GLSP.

100.     ARMG and ARMG (IL) (and later ARMG II after it assumed ARMG's operations) originally associated with Castle Law, a Tennessee law firm, for the purposes of carrying out their scheme.  Under Castle Law's arrangement with ARMG and ARMG (IL), Castle Law accepted referral of timeshare owners with mortgages.  In turn, Castle Law was supposed to remit funds to ARMG and ARMG (IL) as its "cut" of the proceeds received from consumers that had fallen for their scam.  However, Castle Law was an unreliable partner in the scheme, and often failed to remit the agreed-upon payments to ARMG and ARMG (IL).

101.    In response to the cash-flow problems created by Castle Law as a partner in their scheme, the ARMG and ARMG (IL) began using U.S. Consumer Attorneys, P.A. ("USCA") and its affiliated marketing company, 1PlanetMedia, Inc. ("1Planet"), in place of Castle Law. Despite the shift from Castle Law to USCA as the affiliated law firm, the TPE Defendants still lacked the desired level of control over the law firm portion of the scheme.  Additionally, USCA also processed payments from consumers independent of the TPE Defendants and, as with Castle Law, USCA sometimes retained the entire payment for itself.

      **ii.**    **The Creation of Totten to Ensure Greater Control Over the Scheme.**

102.    In order to exercise the maximum degree of control over the scheme, and to cure cash-flow problems that arose through their association with Castle Law, USCA, and 1Planet, the Defendants Eric Cline, Shyla Cline, and Morse set out to form a law firm entirely subservient to their own direction.  As part of this process, the Clines and Morse interviewed several different attorneys (or groups of attorneys), likely to find those that were willing to cede the most control over the law firm's operations to the Clines and Morse as non-attorneys.

103.    The Clines and Morse eventually settled on a partnership with five lawyers: Paul Totten, Esq., Anthony Franqui, Esq., Erica Franqui, Esq., Garry Davis, Esq., and Christopher Burk, Esq.  A copy of the relevant record from the Florida Secretary of State from Totten's formation is attached hereto as Exhibit 2.

104.    The Clines and Morse, through the entities they control, entirely facilitated the creation and funding of the Totten law firm.  Specifically, the ARMG and Redemption provided Totten with office space, gave Totten access to its customer database, and staffed Totten with existing employees from ARMG, with such employees continuing to receive compensation and benefits from ARMG.  Totten does not accept representation from any timeshare owners except

for those referred to it by the other Defendants in this action.  Furthermore, ARMG (and later, from ARMG II after it began operations) has physically stationed several employees in Totten's offices to ensure that Totten operates in the desired manner.

105.    The Clines and Morse also developed the ability to surreptitiously listen to and monitor telephone conversations between Totten and the firm's purported "clients."   Upon information and belief, the "clients" of the Totten law firm speak only with the employees that ARMG has planted within Totten; the "clients" do not actually speak to or interact with the any of the named attorneys for Totten, or any other licensed attorney.

106.    Furthermore, all payments from consumers are processed through ARMG, rather than Totten, which cured the prior cash-flow problems that existed in their relationship with Castle Law and USCA.  Totten receives a portion of the fees that ARMG, ARMG (IL), and ARMG II collect as compensation for its role in the scheme.

107.    By all appearances, Totten lacks any meaningful independence from ARMG, ARMG (IL), or ARMG II and their principals.

108.    Before June 2017, none of the five lawyers associated with the Totten law firm had ever practiced law in the timeshare industry. Yet, these five lawyers from different corners of the country (Totten, A. Franqui and E. Franqui live in South Florida, Davis resides in Ohio, and Burk resides in Nevada) suddenly opened a new firm in Fort Lauderdale, Florida practicing timeshare law.

109.    These five lawyers were oddly (and immediately) successful at their new endeavor.  Shortly after Totten was formed, Bluegreen (and other timeshare developers) began receiving voluminous demand letters from Totten. Since Totten's formation in 2017, Bluegreen alone has received approximately 193 such demand letters from Totten.

110.     Totten also claims to represent individuals from at least 30 states: Texas, California, Pennsylvania, Maryland, Alabama, Ohio, Michigan, Iowa, Missouri, Nebraska, Idaho, Illinois, New York, Tennessee, Kentucky, Delaware, Washington, Arkansas, Oklahoma, Minnesota, Louisiana, North Dakota, North Carolina, South Dakota, New Jersey, Oregon, Kansas, South Carolina, Massachusetts, and Colorado, and two provinces of Canada: British Columbia and Alberta.

111.     Yet Totten engages in no advertising for timeshare-related representation in its own name during this time.  Totten's website, www.tfdblaw.com, is linked to by only one other webpage and receives so little traffic it is not measured by popular web-analytics tools, such as SEM Rush.  Totten has purchased no Google AdWords® or other similar advertising, and besides its websites, Totten undertakes no other advertising activity whatsoever.

112.     Thus, without using any obvious advertising in its own name, and with no prior experience in the timeshare industry, Totten managed to convince hundreds of Bluegreen Owners, plus untold numbers of clients who are customers of other timeshare developers, to retain them from at least 30 states and two Canadian provinces.

113.     The instantaneous success of Totten can only be explained by the fact that the other TPE Defendants funnel and refer a steady stream of timeshare owners to Totten for representation in connection with the timeshare "exit" scheme that they perpetrate, giving the appearance of legitimacy to an otherwise illegitimate enterprise.

### iii.     Totten does little or nothing to represent Bluegreen Owners.

114.     The demand letters sent by Totten ("Demand Letters") are formulaic and typically lack individualized factual and legal analysis. A sampling of these form Demand Letters is attached hereto as Exhibit 3.

115.     The Demand Letters do not threaten a lawsuit of any kind, but vaguely state that Totten's representation is "in connection with the Clients' rights and alleged obligations" of the timeshare purchase and "shall include defense of any claims asserted or otherwise instituted by the Timeshare [Bluegreen], including foreclosure proceeding(s), if any, . . . .  Accordingly, we are presently in the process of investigating the facts and circumstances surrounding" the timeshare purchase(s) by the Bluegreen Owner.  Totten promises to "supplement" its Demand Letters with "correspondence in the future with our specific demand and allegations, if any."

116.     The vagueness and non-specificity of the Demand Letters demonstrate that such letters are for mere appearance.  Totten sends the Demand Letters so that the TPE Defendants can relay to Bluegreen Owners that their attorneys have initiated negotiations with Bluegreen or otherwise begun the "exit" process. Contrary to what the Demand Letters state, Totten rarely, if ever, represents timeshare owners in any proceeding related to their timeshare interests.

117.     The Demand Letters also demand that Bluegreen cease all communication and correspondence with the Bluegreen Owners (with limited exceptions).  In this way, Totten seeks to quarantine all communications with the Bluegreen Owners, actively interfering with the contractual relationship between Bluegreen and the Bluegreen Owners.

118.     All payments by Bluegreen Owners are made directly to ARMG, who then shares with Totten some amount of the payment as compensation for Totten's role in the scheme.

119.     Such an arrangement violates a number of state bar association rules, including, without limitation, Rule 4-7.22 of the Florida Rules of Professional Conduct, which generally prohibits the splitting of attorney fees with referral sources.

120.     Furthermore, Totten's website states that the firm's legal practice consists of "bodily/personal injury law," "regulatory and compliance defense," and "general corporate law." A copy of Totten's website is attached hereto as Exhibit 4.

121.     Totten has not been involved in any publicly filed cases involving anything other than timeshare law.  Rather, when a non-timeshare case appears, the lawyers of Totten handle those cases under their other firm's name, Franqui Totten, LLP.  For example:

> i.    *Nearbrook Capital, LLC v. Nosal Funding, LLC*, Case No. 2018-004531-CA-01, pending in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, which was filed by Anthony Franqui, Esq. and Paul Totten, Esq. under the signature block of Franqui Totten, LLP and utilizing their Franqui Totten – not their TFDB Law – emails: Tony@ftlawgroup.com and Paul@ftlawgroup.com;
>
> ii.   *Unimed International Inc. v. Dermagist, Inc. et al.*, Case No.: 9:18-cv-80148-MIDDLEBROOKS/BRANNON, pending in the United States District Court for the Southern District of Florida, which was filed by Anthony Franqui, Esq. (as local counsel) under the signature block of Franqui Totten, LLP and utilizing his Franqui Totten – not his TFDB Law – email: Tony@ftlawgroup.com; and
>
> iii.  *Jagolinzer v. Martinez de Castro et al.*, Case No.: 2018-005816-CA-01, pending in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, in which Paul Totten, Esq. appeared under the signature block of Franqui Totten, LLP and utilizing his Franqui Totten – not his TFDB Law – email: Paul@ftlawgroup.com.

122.     In addition, the Totten lawyers claim to practice or be a partner in more than one law firm, in contradiction with what they have told their respective state bar associations.

> i.    Paul Totten, Esq. is registered with the Florida Bar as a member of the Totten firm (see Exhibit 5 hereto), yet he is still a partner at Franqui Totten, LLP and appears in lawsuits on behalf of Franqui Totten, LLP.
>
> ii.   Anthony Franqui, Esq. is registered with the Florida Bar as a member of Franqui Totten, LLP (*see* Exhibit 6 hereto), yet he has appeared in lawsuits as an attorney of Totten and claims to be a partner in Totten;
>
> iii.  Erica Franqui, Esq. purports to be the managing partner of Franqui Totten, LLP and registered with the Florida Bar as a member of Franqui Totten,

LLP (*see* Exhibit 7 hereto), yet she also claims to be a partner in Totten; and

iv.     Christopher Burk, Esq. is listed as a partner in Totten, yet he registered with the Nevada Bar as a member of a firm named Ayon Burk Injury Law (*see* Exhibit 8 hereto).  Burk is also the owner and president of The Patriot Law Firm Corp.  A copy of the relevant record from the Nevada Secretary of State is attached as Exhibit 9.

123.    In sum, based on the sudden volume of clients referred by the TPE Defendants, combined with Totten's failure to perform much, if any, legal services on behalf of the Bluegreen Owners it purports to represent, Totten is little more than a legal front for the larger TPE Defendants' scam.  Put a different way, Totten was formed either primarily or solely to act as the puppet 'law firm' of the larger TPE conspiracy.

## I.    <u>INDUCING THE TIMESHARE OWNERS TO BREACH</u>

124.    Defendants' so-called "exit process" typically begins and ends with nothing more than the threat of litigation against Bluegreen as a means to pressure Bluegreen to release their clients, the Bluegreen Owners, from the Timeshare Contracts.

125.    When the threat of litigation fails, as it usually does, the Defendants' "exit process" requires the Bluegreen Owners to breach their Timeshare Contracts and therefore "exit" the Timeshare Contracts through default.

126.    In order to effectuate this outcome, Defendants instruct or convince their clients, the Bluegreen Owners, to cease making all payments on the Timeshare Contracts as part of the "exit process."  Defendants do not disclose to their clients the consequences of ceasing payments, or that their "exit" will actually be a breach of the Timeshare Contracts due to non-payment, leading to termination of their beneficial interest and rights in the timeshare.

127.    When the owners' beneficial interests transferred pursuant to the Timeshare Contract are terminated, Defendants then represent to their clients that they have successfully "canceled" or "exited" their Timeshare Contracts.

128.     These statements of success are inherently misleading, because the breach of a Timeshare Contract is not a cancellation, release, or "exit" of that contract, but quite the opposite.  In general, when a party breaches a contract, the defaulting party is beholden by the contract for any resulting damages and penalties.  Rather than escape the contract, the breaching party incurs the full consequences of breaching the Timeshare Contract.  In other words, what Defendants deceptively call an "exit" or "cancellation" of the Timeshare Contracts, the law calls a "breach" and "enforcement" of those contracts.

129.     To achieve this semantic subterfuge, Defendants direct their clients not to contact Bluegreen and also forbid Bluegreen from contacting their clients, the Bluegreen Owners, under the guise of Defendants' ongoing legal representation of them.  In this way, Defendants control the flow of information to and from their clients, and they block any information that might otherwise warn their clients of the impending breach and termination until after it is too late.

## J.     RESULTING DAMAGES

130.     Bluegreen is damaged by the TPE Defendants' false advertising because the Bluegreen Owners are misled into stopping all payments under the Timeshare Contracts (including any associated promissory notes).   A representative exemplar of Bluegreen's Timeshare Contract is attached hereto as Exhibit 10.

131.     Through the advertising and subsequent interaction, including direct and intentional communication to cease making payments, Defendants wrongfully convince and induce Bluegreen Owners to breach their Timeshare Contracts with BVU, thus negatively impacting Bluegreen's revenue and sales, and causing the termination of the owner's beneficial interest in the timeshare (and, though they are generally unaware it is occurring, the Bluegreen Owner's credit is negatively impacted as well).  A representative sampling of notices delivered to owners of their beneficiary interests is attached hereto as Exhibit 11.

132.    Because BVU is a wholly-owned subsidiary of BVC, all damages suffered by BVU as a result of the Bluegreen Owners' breach flow directly to, and thus, are equally incurred by, BVC. Additionally, as the creditor entitled to receive payments under certain promissory notes executed by Bluegreen Owners, BVC directly suffers damages upon the default of Bluegreen Owners under the Timeshare Contracts.

133.    In addition to the lost revenue and profits, Bluegreen incurs expenses in enforcing its rights under the Timeshare Contracts.

### K.    THE CONSPIRACY – THE DEFENDANTS ARE ALL CONNECTED

134.    While ARMG is, itself, only a single entity, it is interrelated with the other Defendants to form a wide-reaching network intended to defraud timeshare owners, including Bluegreen Owners, and cause severe damage to Bluegreen by interfering with its Timeshare Contracts.

135.    Tools exist that allow users to uncover the various webpages that link to a particular domain name.  For example, linking to a particular page is known as 'backlinking' while each link back to one web page from another web page is known as a 'linkback'.

136.    There are many potential uses for linkbacks.  For the Defendants, there are two main objectives. First, linkbacks are one of the methods various search engines, such as google.com and bing.com, use to rank a page and determine how close to the top of a list of search results that page will appear. Second, linkbacks can show how one web page interacts with, and transmits data to, a second webpage.

137.    Numerous of the TPE Defendants' websites backlink directly to ARMG's website at the www.resortrelease.com domain name.

138.    These linkbacks can either direct visitors directly to content hosted at www.resortrelease.com or cause information entered on the other TPE Defendants' websites to be captured and sent directly to ARMG.  The latter is far more common.

139.    For example, the capturing and transmission of information from www.cancelatimesharecontract.com, a website run by Redemption, works in the following way. On many (if not all) of the individual webpages located at www.cancelatimesharecontract.com is a box or series of boxes, together with a clickable button, that prompt users to enter their contact information to receive a free consultation for timeshare-related services.

140.    However, when a user enters information and clicks on the clickable button, unbeknownst to the user, the information entered is not transferred to Redemption.  It is, instead, transferred to a program running on e.resortrelease.com.  A copy of webpage source code from www.cancelatimesharecontract.com showing this behavior is attached hereto as Exhibit 12.

141.    Thus, when users click on many of the buttons and other items located at www.cancelatimesharecontract.com, instead of sending their information to Redemption, their information is instead sent directly to ARMG and its customer relationship management software (known as Mautic).  "Mautic provides free and open source marketing automation software available to everyone.  Free email marketing software, lead management software and more."[1]

142.    This behavior of sharing information is purposefully hidden and never disclosed to consumers.

143.    The following websites run by the TPE Defendants work in a near identical fashion to www.cancelatimesharecontract.com, capturing consumer information and transmitting it, without the consumer's knowledge, directly to ARMG:

---

[1] http://www.mautic.com (last accessed Aug. 6, 2018).

     i.     www.resortexitteam.com

     ii.    www.redemptionandrelease.com

     iii.   www.redemptionandrelease.ca

     iv.   www.myredemptionservices.com

144.    In addition to sharing consumer information, the TPE Defendants share content of each other's websites, too.  For example, despite being operated by different Defendants, the websites located at https://americanresourcemanagementgroup.com/ and https://www.redemptionandrelease.com/ both ask (or have asked), "Need Your Contract Cancelled Now?" and have the exact same form to fill out.  C of these websites are attached as Exhibits 13 & 14.  The source code for each webpage shows that both forms send information to e.resortrelease.com.

145.    Similarly, one of the websites operated by Redemption, https://cancelatimesharecontract.com/truth-about-maintenance-fees/, promotes a video hosted by ARMG at www.resortrelease.com/video, stating "This is a link to a video that showcases how this company called Resort Release spent five years researching about the timeshare industry: https://www.resortrelease.com/video/"

146.    Redemption even posted a blog entry dated January 5, 2016, available at https://cancelatimesharecontract.com/resort-release-reviews/, that endorsed and recommended Resort Release as a "meticulous" timeshare "release company."

147.    The websites for Resort Exit (www.resortexitteam.com) and ARMG (www.resortrelease.com and www.americanresourcemanagementgroup.com) advertise the same address at 6785 Weaver Road, Rockford, Illinois 61114.  The websites also utilize the same

picture of their company "founders" and state that Resort Exit was established on January 22, 2012, the same date as ARMG.

148.     The websites for Defendant Resort Exit (www.resortexitteam.com) and Defendant Resort Release (www.resortrelease.com and www.americanresourcemanagementgroup.com) advertise the same address at 6785 Weaver Road, Rockford, Illinois 61114.  The websites also utilize the same picture of their company "founders" and state that Resort Exit was established on January 22, 2012, the same date as Resort Release.

149.     The following facts indicate that Totten is working with the TPE Defendants to effectuate their scheme:

      i.      Totten and Resort Release share or have shared at least one employee. Mr. German Beard previously listed his employment on LinkedIn as a "Law Clerk/Contract Auditor at Resort Release/Totten Franqui Davis & Burk, LLC".  A copy of Mr. Beard's prior LinkedIn profile is attached hereto as Exhibit 15.  Until recently, Mr. Beard was also listed as a 'law clerk' on the Resort Release webpage, a copy of which is attached hereto as Exhibit 16; and

      ii.      Totten advertises its address as 1451 W. Cypress Creek Rd., Suite 211, Fort Lauderdale, FL 33309 (available at www.tfdblaw.com).  The "Terms of Use" for www.vacationpropertiesforless.com, a copy of which is attached hereto as Exhibit 17, lists Defendant Vacation Properties' address in the same building at 1451 W. Cypress Creek Rd., Suite 300, Fort Lauderdale, FL 33309.

iii.        In the State of North Carolina, Totten operates as a professional limited liability company under the name "Totten Franqui Davis & Burk, PLLC." Attached as Exhibit 18 is a copy of the North Carolina Secretary of State online records for Totten, which lists Totten's principal address as 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304.  The 'Terms and Conditions' for Redemption's websites located at www.cancelatimesharecontract.com (available at https://cancelatimesharecontract.com/terms-and-conditions/); www.myredemptionservices.com (available at http://myredemptionservices.com/terms-and-conditions/); and www.redemptionandrelease.com (available at https://www.redemptionandrelease.com/terms-of-service/), copies of which are attached hereto as Composite Exhibit 19, state that Redemption's websites and services "shall be governed by and construed in accordance with the laws of 2455 E Sunrise Blvd, Fort Lauderdale, FL, 33304, United States."  Furthermore, until recently, Redemption registered its principal place of business as 2455 East Sunrise Boulevard, Suite 415, Fort Lauderdale, Florida 33304.  A copy of the Florida Secretary of State records for Redemption's 2017 and 2018 Annual Reports is attached hereto as Exhibit 20, which shows the recent change of address.

iv.        In addition to being a partner in Totten and being a partner in Ayon Burk, Christopher Burk, Esq. is also the sole owner and officer of The Patriot Law Firm Corp. in Nevada.  The Patriot Law Firm Corp. maintains a

website at www.fightforthelittleguy.com, advertising personal injury legal services.  Until very recently, an entity with a Nevada address known as "Patriot Law Group" advertised TPE services at the website www.patriotlawgroup.com.           However,      the       website       at www.patriotlawgroup.com has been deactivated and removed.  A copy of the website was recently archived, however, and is attached as Exhibit 21.  Nevada has no business records of any entity known as "Patriot Law Group."  With such similar names, it is highly probable that Burk is the lawyer involved in the "Patriot Law Group's" TPE activity.  Patriot Law Group in Nevada advertised the same telephone number as Defendant Timeshare Freedom advertises for its TPE services – (866) 668-6872 – although Timeshare Freedom has no locations in Nevada.

150.     Based on the above facts, Totten and its attorneys are related to, receiving client referrals from, and/or working on behalf of, Resort Release and the other TPE Defendants.

### L.    PERSONAL LIABILITY OF THE INDIVIDUALS RUNNING THE TPE DEFENDANTS AND DIRECTING THE UNLAWFUL CONDUCT

151.     Historically, once a TPE company is shutdown via court intervention, a new TPE company with the same principals is created and put in action.

152.     Therefore it is imperative that the individual Defendants, Scott Morse, Eric Cline, and Shyla Cline (hereinafter, the "Individual Defendants") be held individually liable for the unlawful conduct alleged herein and thereby prevented from opening new entities to conduct the same or a similar scam.

153.     Former employees of one or more of the TPE Defendants have corroborated the personal and intimate involvement of the individual Defendants named herein.

- 45 -

154.    Defendants Morse, Eric Cline, and Shyla Cline actively and knowingly cause the false advertising by ARMG, Redemption, Resort Exit, and VPL.  Copies of the Florida Secretary of State records for ARMG, Redemption, Resort Exit, and VPL are attached hereto as Exhibits 22 through 25, respectively.

155.    Upon information and belief, have expanded such practices through their management and operation of ARMG II, ARMG (IL), Redemption II, and VPL II.  They direct, control, ratify, authorize, personally participate in, and/or are the moving forces behind the false and misleading advertising alleged herein.

156.    More than just being officers and managers of these entities, the individual Defendants Morse, Eric Cline, and Shyla Cline directly participate in the interference of Bluegreen Owners' Timeshare Contracts, including, without limitation, the following:

    i.    Eric Cline personally oversees and directs the sales team, Shyla Cline oversees and directs the administrative staff and operations, and Morse is responsible for marketing the operations;

    ii.    Eric Cline, Shyla Cline, and Morse each interviewed groups of attorneys to become part of their scheme when forming Totten;

    iii.    Eric Cline and Morse each monitor telephone calls between Totten and timeshare owners in order to evaluate Totten's effectiveness in retaining customers;

    iv.    Eric Cline engages in sales calls with timeshare owners to convince them to pay exorbitant fees for the TPE Defendants' services;

    v.    Shyla Cline personally appears in online advertisements for ARMG;

    vi.    Shyla Cline is responsible for and oversees the administrative staff of some or all of the TPE Defendants, and for the disposal of timeshare interests that the TPE Defendants purport to acquire;

    vii.    Shyla Cline personally calls timeshare owners that had paid fees to the TPE Defendants to congratulate them on becoming customers;

viii.   Morse personally interacts with timeshare owners by acting as (and later overseeing) the "verification department," which would call timeshare owners to verify their contract and personal information;

ix.   Morse handles all demands from timeshare owners that discovered that Defendants falsely represented their services; and

x.   Morse is responsible for the method of advertising, and content of the false, misleading, and deceptive advertisements set forth above, for most if not all of the TPE Defendants.

## M.   BLUEGREEN'S RIGHT TO INJUNCTIVE RELIEF

157.   The TPE Defendants' solicitation of Bluegreen Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Bluegreen Owners to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and club dues payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Plaintiffs, causing ongoing harm to Bluegreen.

158.   Defendants continue to engage and intend to further engage in the unlawful conduct described above.

159.   Defendants' actions present an immediate threat of irreparable harm to Bluegreen, and Bluegreen will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

160.   The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Bluegreen Owners using the false and misleading advertising outlined above; and then convince the Bluegreen Owners to immediately stop paying.  These defaults result in loss of good will and damages to the customer relationship with other Bluegreen Owners that are not in default and enjoying their Bluegreen Contracts.

161.   Non-defaulting Bluegreen Owners are also damaged because the non-payment of club dues and maintenance fees by the defaulting Bluegreen Owners force the non-defaulting

Bluegreen Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

162.    Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and club dues payments owed to them and will be forced to expend monies terminating the beneficiary rights of defaulting Bluegreen Owners to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

163.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity.

164.    The injury and potential harm caused by Defendants' intentional inference with Bluegreen's relationships outweigh the harm, if any, that an injunction would cause to Defendants.

165.    The issuance of the requested injunction will serve the public interest by protecting Bluegreen's legitimate business interests and the interests of the Bluegreen Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

### N.    CAUSES OF ACTION

**COUNT I**
**False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(ARMG, ARMG II, ARMG (IL), Redemption, Redemption II, VPL, VPL II, Resort Exit, Eric Cline, Shyla Cline, and Morse)

166.    Bluegreen adopts and realleges paragraphs 1 through 162 above as if fully set forth herein.

167.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

168.    Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The

statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

169.     The representations described above were commercial speech made by a Defendant acting in competition with Bluegreen by trying to interfere with Bluegreen's business relationships for Defendants' own financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

170.     Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

171.     Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Bluegreen or to contact Bluegreen to determine whether legitimate exit options are available.

172.     Defendants deceive the consuming public by knowingly concealing the existence of legitimate options available to Bluegreen Owners, and instead tell consumers that Bluegreen will do nothing to help consumers end their timeshare ownership.

173.     Defendants' advertised services affect interstate commerce.

174.     Defendants are operating as competitors to Bluegreen.  Once a Bluegreen Owner enters into an agreement with a TPE Defendant, the sole purpose of that agreement is to cause that Bluegreen Owner to withdraw his or her business from Bluegreen, effectively converting that individual from a Bluegreen Owner to a customer of the Defendant.

175.     Bluegreen has been and continues to be injured as a result of Defendants' false and misleading statements.

176.     Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Bluegreen Owners, and (iii) the costs of the action.

177.     Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Individual Defendants and the TPE Defendants, as well as their agents, representatives, employees, affiliates, prohibiting Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in other electronic or print media or materials, advertising any ability to legitimately cancel or end timeshare contracts, including those of the Bluegreen Owners.

## COUNT II
## Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against Totten)

178.     Bluegreen adopts and realleges paragraphs 1 through 162 above as if fully set forth herein.

179.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

180.    The TPE Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

181.    Bluegreen has been and continues to be injured as a result of the TPE Defendants' false and misleading statements.

182.    Totten has contributed and continues to contribute to the TPE Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

183.    Totten explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without Totten's willingness to accept those consumers as clients, the TPE Defendants could not advertise what they do.

184.    The TPE Defendants' false advertisements are public, serious, and widespread, and Totten has full knowledge of such advertising and condones it.

185.    More than that, Totten financially gains from the false advertisements in the form of client referrals and fee splitting with the TPE Defendants.

186.    In other words, Totten's business derives much, if not all, of its revenue from the consumers solicited through the TPE Defendants' false advertising.

187.    Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover (i) its actual damages sustained as a result of the false advertising by the TPE Defendants, (ii) Totten's profits resulting from the TPE Defendants' false advertising to Bluegreen Owners, and (iii) the costs of the action.

188.    Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Totten of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Totten for damages, corrective advertising, and disgorgement of Totten's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against Totten, as well as their agents, representatives, employees, affiliates, prohibiting Totten from further contributing to the false and misleading statements in advertising, including accepting any clients solicited by the other Defendants through the false advertisement of any ability to legitimately cancel or end timeshare contracts, including those of the Bluegreen Owners.

## COUNT III
## Tortious Interference with Contractual Relations
(against all Defendants)

189.    Bluegreen adopts and realleges paragraphs 1 through 162 above as if fully set forth herein.

190.    This is a cause of action for tortious interference with contractual relations.

191.    Bluegreen has contractual relationships with its timeshare owners.

192.    Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Bluegreen and the Bluegreen Owners. The very fact that Plaintiffs have a business relationship with the Bluegreen Owners is the basis upon which Defendants sought to establish a relationship with the Bluegreen Owners.  Indeed, if it were not

for the existence of the contractual relationships between Bluegreen and the Bluegreen Owners, Defendants would have no reason to exist.

193.    Defendants, through various inter-related entities as described hereinabove, have successfully solicited Bluegreen Owners and caused or induced them to breach and/or terminate their contractual relationships with Bluegreen, including specifically, with BVU.

194.    In particular, Defendants have intentionally procured the breach of Bluegreen's contractual relationships by soliciting Bluegreen Owners and persuading them to hire Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. Defendants also procure breaches by directly instructing Bluegreen Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

195.    If Bluegreen Owners knew the truth about Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

196.    Defendants have utilized improper, fraudulent and/or illegal means to interfere with Bluegreen's contractual relations.

197.    Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

198.    As a direct and proximate result of Defendants' intentional misconduct, Bluegreen Owners have terminated, or have baselessly sought to terminate, their contractual

relationships with Plaintiffs and, more specifically, BVU, after the Bluegreen Owners' statutory rescission period has expired. These terminations, and attempted terminations, also interfere with Bluegreen's ability to enter into subsequent transactions with those same Bluegreen Owners.

199.     Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Bluegreen and its Owners, and their interference with Bluegreen's business is willful and malicious.

200.     Furthermore, Totten profits greatly by accepting significant fees from Bluegreen Owners (through the ARMG entities) then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts. Totten is not privileged to interfere with Bluegreen's contractual relationships because Totten acts in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by Totten or even the best course of action to cancel the Timeshare Contract, considering the Owner could *lawfully* avail herself of potential exit options from her Bluegreen ownership for free, or at a much lower cost, by appealing directly to Bluegreen. Furthermore, Totten undermines its so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Owners for the equitable rescission of those Timeshare Contracts. Totten's across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

201.    As a direct and proximate result of the foregoing, Bluegreen has suffered and will continue to suffer damages.

202.    Bluegreen is entitled to damages against all Defendants jointly and severally.

203.    Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Bluegreen in the disruption of customer and other contractual relations; therefore, Bluegreen does not have an adequate remedy at law.

204.    Defendants' conduct is intentional and willful and entitles Bluegreen to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against Defendants and their agents, representatives, employees, and affiliates, prohibiting Defendants from contacting Bluegreen Owners and/or otherwise interfering with Bluegreen's contractual relationships with such Bluegreen Owners.

### COUNT IV
### Civil Conspiracy to Commit Tortious Interference
(against all Defendants)

205.    Bluegreen adopts and realleges paragraphs 1 through 162 above as if fully set forth herein.

206.    This is a cause of action for civil conspiracy to interfere with existing contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

207.    Defendants are parties to a civil conspiracy, as described herein.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

208.    Defendants conspired to do an unlawful act to cause Bluegreen harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Bluegreen's contractual relations with it owners and collectively causing its owners to breach their Timeshare Contracts with Plaintiffs.

209.    Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Bluegreen's contractual relations or to induce Bluegreen's customers to breach their Timeshare Contracts.

210.    Defendants conspired to interfere with Bluegreen's contractual relationships with the Bluegreen Owners and/or were directed by other Defendants to interfere with Bluegreen's contractual relationships with the Bluegreen Owners.

211.    As a direct and proximate result of Defendants' civil conspiracy, Bluegreen Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those Contracts.

212.    Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

213.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Bluegreen and its business millions of dollars in actual damages.

214.    Defendants are jointly and severally liable to Plaintiffs for damages.

215.    Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide their misconduct, and to divert and abscond with funds from Bluegreen Owners and interfere with the contractual relationships between Bluegreen Owners and Bluegreen.

216.    Defendants acted willfully and with malice in taking these actions.

217.    Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter judgment in their favor and against Defendants, jointly and severally, for all damages suffered together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT V
### Violations of Florida's Deceptive and Unfair Trade Practices Act
(against all Defendants)

218.    Bluegreen adopts and realleges paragraphs 1 through 162 above as if fully set forth herein.

219.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

220.    Bluegreen is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

221.    Bluegreen Owners are consumers for the purposes of FDUTPA.

222.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

223.    Defendants are engaged in deceptive and unfair practices, including luring Bluegreen Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Bluegreen consumers to pay substantial fees to "cancel" their contracts with Bluegreen, when, in many instances, a lawful cancellation of their ownership is only available to consumers directly from Bluegreen, a party to the Timeshare Contracts.

224.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future."

225.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under Fla. Stat. § 510.211(2).

226.    Bluegreen is a party aggrieved by Defendants' violation of Fla. Stat. § 501.204.

227.    As a result of Defendants' actions, Bluegreen has suffered damages.

228.    Bluegreen's damages will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

229.    Bluegreen is entitled to recover its attorney's fees and costs from Defendants under Fla. Stat. §§ 501.2105, 501.211.

WHEREFORE, Bluegreen respectfully request the Court enter injunctive relief against all Defendants, award Plaintiffs heir damages and costs, including reasonable attorney's fees, and for such other and further relief as the Court deems appropriate.

Dated: April 9, 2019.

*/s/ Alfred J. Bennington, Jr.*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com

**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 100562
cleger@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**FRANCIS A. ZACHERL, III**
Florida Bar No. 868094
fzacherl@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of April, 2019, the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF System, which will send a notification of filing via electronic mail to:

Michael N. Kreitzer, Esq.
Email: mkreitzer@bilzin.com
Secondary Email: mavin@bilzin.com
Michael E. Strauch
Email: mstrauch@bilzin.com
Secondary Email: mavin@bilzin.com
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: 305-374-7580
Facsimile: 305-374-7593

And

Shannon L. Zetrouer, Esq.
Email: szetrouer@zp-legal.com
Secondary Email: eschoos@zp-legal.com
Tyson James Pulsifer, Esq.
Email: tpulsifer@zp-legal.com
Secondary Email: eschoos@zp-legal.com
Zetrouer Pulsifer, PLLC
9355 113th St. N. #4250
Seminole, FL 33775
Telephone: 727-440-4407

*Attorneys for Defendants, ARMG Holdings LLC, f/k/a American Resource Management Group, LLC d/b/a Resort Release;  American Resource Management Group, LLC, American Resource Management Group, LLC, VPL Holdings LLC, f/k/a Vacation Properties For Less, LLC; Vacation Properties for Less, LLC, Redemption Holdings USA LLC, f/k/a Redemption and Release, LLC; Redemption and Release, LLC, Resort Exit Team, LLC, Eric S. Cline a/k/a Stephen E. Cline, Shyla Cline, Larry Scott Morse a/k/a Scott Morse*

Carmen Y. Cartaya, Esq.
Email: CCartaya@mscesq.com
Secondary Email: pramos@mscesq.com
Douglas McIntosh, Esq.
Email: dmmpleadings@mscesq.com
Secondary Email: vhyndman@mspcesq.com
McIntosh Cawran & Cartaya, P.A.
1776 East Sunrise Blvd.
Fort Lauderdale, Florida 33304
Telephone: 954-765-1001
Facsimile: 954-765-1005

*Attorneys for Defendants, Totten Franqui Davis &
Burk, LLC and Totten Franqui Davis & Burk PLLC*

/s/ Alfred J. Bennington, Jr.
**ALFRED J. BENNINGTON, JR. ESQ.**